PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3876
_____

HAN TAK LEE

v.

SUPERINTENDENT HOUTZDALE SCI;
DISTRICT ATTORNEY MONROE COUNTY;
ATTORNEY GENERAL PENNSYLVANIA

Superintendent Houtzdale SCI;
District Attorney Monroe County,
                                          Appellants
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 4-08-cv-01972)
District Judge: Honorable Martin C. Carlson
_____

Argued on June 18, 2015

Before: AMBRO, FUENTES,
and GREENBERG, Circuit Judges

(Filed: August 19, 2015)

Mark S. Matthews, Esq.
Matthew J. Bernal, Esq.     (Argued)
Monroe County District Attorney's Office
Monroe County Courthouse
610 Monroe Street, Suite 126
Stroudsburg, PA 18360
         *Counsel for Appellants*

Peter Goldberger, Esq.        (Argued)
Pamela A. Wilk, Esq.
50 Rittenhouse Place
Ardmore, PA   19003-2276
         *Counsel for Appellee*

─────────────────

OPINION

─────────────────

AMBRO, Circuit Judge

Appellee Han Tak Lee was convicted of murdering his daughter based primarily on scientific evidence that, as the Commonwealth now concedes, is discredited by subsequent scientific developments. Lee thus filed a § 2254 *habeas* petition claiming his conviction violated due process. The District Court granted *habeas* relief, and we affirm.

## I.    Background[1]

Mr. Lee's daughter, Ji Yun Lee, suffered from severe mental illness throughout her life, experiencing both suicidal and homicidal ideation. She lived with her family in New York during the summer of 1989. In the early morning of July 28, police officers found Lee retrieving personal items from the street that his daughter had thrown out the window. The officers entered the house and found Ji Yun in a manic state, arguing with family members who were urging her to take her medications. The officers observed no evidence of violence against her.

At the suggestion of his pastor, Lee took his daughter the same day to Camp Hebron, a religious retreat in Monroe County, Pennsylvania. Her erratic behavior continued. Soon after arriving, Ji Yun went for a walk and returned several hours later soaking wet, having jumped into a body of water. Later that day, she became agitated and had to be physically restrained. A few hours after midnight, a fire began in the Lees' cabin. Han Tak Lee escaped, but his daughter died.

The Commonwealth charged Lee with arson and murder. During an eight-day trial, it relied heavily on fire-science and gas-chromatography evidence to argue that Lee intentionally set the fire to kill his daughter. The defense countered that she set the fire as a suicidal act. Lee was convicted on both charges and sentenced to life imprisonment without the possibility of parole.

On direct appeal, the Superior Court of Pennsylvania remanded for an evidentiary hearing on ineffective-

---

[1] We discussed the background of this case in greater detail in our prior opinion. *See Lee v. Glunt*, 667 F.3d 397, 400–03 (3d Cir. 2012).

3

assistance-of-counsel claims. During that hearing, the Court also received evidence about developments in the field of fire science that, according to a prior panel of our Court, "provided ample reason to question the reliability of the arson investigation." *Lee v. Glunt*, 667 F.3d 397, 401 (3d Cir. 2012). The trial court nonetheless denied Lee's claims, the Superior Court affirmed, and the Pennsylvania Supreme Court denied appeal.

In 1995 Lee filed a *pro se* post-conviction petition in state court. The Commonwealth did not comply with the court's order to respond, and the petition remained pending until 2001 when the attorney who is now representing Lee filed leave to amend the petition. He submitted an amended petition in 2005, arguing that (1) Lee was entitled to a new trial because of newly discovered and exculpatory scientific evidence, and (2) appellate counsel was ineffective on direct appeal by failing to raise a claim of after-discovered exculpatory evidence. The Court of Common Pleas denied the petition for post-conviction relief, the Superior Court affirmed, and the Supreme Court of Pennsylvania denied appeal.

Lee filed a § 2254 *habeas* petition in the District Court for the Middle District of Pennsylvania, claiming that (1) his conviction violated due process because it was based on inaccurate and unreliable evidence and (2) his continued incarceration also lacked the due process due him because newly developed scientific evidence showed he was probably innocent.[2] The District Court denied Lee's petition and request for an evidentiary hearing because "claims of actual innocence based on newly discovered evidence are never grounds for federal *habeas* relief absent an independent

---

[2] The Commonwealth conceded that Lee exhausted state court remedies. *See Lee*, 667 F.3d at 402.

constitutional violation." *Lee v. Tennis*, No. 08-1972, 2010 WL 3812160, \*5 (M.D. Pa. Sept. 22, 2010).

A panel of our court reversed on appeal. Explaining that Lee's petition raised a due-process claim rather than a free-standing innocence claim, *Lee*, 667 F.3d at 403 n.5, we ordered the District Court to grant discovery and then reconsider whether to hold an evidentiary hearing. *Id.* at 404–07 & n.7. We instructed that Lee "must show that the admission of the fire expert testimony undermined the fundamental fairness of the entire trial because the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Id.* at 403 (citation and internal quotation marks omitted, alteration in original). We also implied that *habeas* relief should be denied if there is "ample other evidence of guilt." *Id.* at 407 n.13 (quoting *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007)).

On remand, Magistrate Judge Carlson held an evidentiary hearing and issued a Report & Recommendation (R&R) finding that "the admission of the fire expert testimony undermined the fundamental fairness of the entire trial" because the "verdict . . . rest[ed] almost entirely upon scientific pillars which have now eroded." *Lee v. Tennis*, No. 08-1972, 2014 WL 3894306, at \*15–16 (June 13, 2014) [hereinafter R&R]. It also found that the Commonwealth failed to show other "'ample evidence' of guilt upon which the jury could have relied." *Id.* at \*18 (quoting *Albrecht*, 485 F.3d at 126).

Along with a two-page memorandum, the Commonwealth filed three objections to the R&R before the District Court:

> 1. [It] underplayed the strength of the Commonwealth's case in general.
> 2. [It] overstated the importance of the differences between the spectrographs for Lee's pants and shirt, and the jug and the glove found at the fire scene.
> 3. []Lee has not been exonerated by the new fire science evidence.

App. E. at 1–3.

The District Court rejected the third objection because, as explained in our prior opinion in this case, Lee's due-process claim does not require a showing of innocence. *Lee v. Tennis*, No. 08-1972, 2014 WL 3900230, \*5 (M.D. Pa. Aug. 8, 2014) (citing *Lee*, 667 F.3d at 403 n.5). In addition, the Court rejected the first and second objections because the Commonwealth failed to identify with specificity any legal or factual errors in the R&R. *Id.* In the absence of any proper objections, the District Court reviewed the R&R for clear error and adopted it without changes. *Id.* at \*4–5. It then issued an order granting *habeas* relief unless the Commonwealth "retr[ied] . . . or release[d]" Lee within 120 days. *Id.* at \*7.

The Local Rules in the Middle District of Pennsylvania require filing a notice of appeal electronically. The District's electronic filing system requires that the moving party simultaneously pay a $505 filing fee. As the credit account for the County of Monroe limits payments to $500, the Commonwealth was unable to pay the fee by credit card. Instead, it mailed a notice of appeal along with a check on September 5, 2014. The District Court Clerk's Office received the package on September 8, exactly 30 days after entry of judgment. The docket initially indicated that the

6

notice was filed the next day, September 9, but a few weeks later the Clerk's Office noted on the docket that the "[f]iled date for the notice of appeal has been corrected to reflect the date of 9/8/2014, the date it was received by the Court."

## II.    Jurisdiction

A "certificate of appealabilty is not required when a state . . . appeals" a grant of *habeas* relief.  Fed. R. App. P. 22(b)(3); *see also Lambert v. Blackwell*, 387 F.3d 210, 230 n.16 (3d Cir. 2004).  We thus have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253(a) if the Commonwealth "filed" a notice of appeal "within 30 days after the entry of . . . judgment."  28 U.S.C. § 2107.

Lee first argues that the notice of appeal was untimely because the Clerk's Office did not file it until 31 days after entry of judgment.  This is a non-starter.  Under Federal Rule of Civil Procedure 5(d)(2), a notice of appeal is "filed by delivering it . . . to the clerk," *id.*, and is delivered when *received* by the clerk, *Parissi v. Telechron, Inc.*, 349 U.S. 46, 47 (1955) (*per curiam*) ("[T]he Clerk's receipt of the notice of appeal within the 30-day period satisfied the requirements of § 2107."); *United States v. Solly*, 545 F.2d 874, 876 (3d Cir. 1976) ("The date of receipt by the clerk's office controls, rather than the date it is filed by the clerk's personnel.").  The parties and the Clerk's Office all agree that the notice was received on the 30th day.  That it was not filed officially until the day after is irrelevant to our jurisdiction.

Lee next argues that the notice of appeal cannot confer appellate jurisdiction because its format did not comply with local rules.  As he points out, under Federal Rule of Civil Procedure 5(d)(3) a "court may . . . allow papers to be filed . . . by electronic means" and "may *require* electronic filing . . . if reasonable exceptions are allowed."  *Id.*

(emphasis added). Local Rule 5.6 in the Middle District of Pennsylvania states that "[a]ny document required or permitted to be filed shall be filed electronically." M.D. Pa. R. 5.6. According to Lee, the Commonwealth's notice of appeal is invalid because it was submitted on paper in violation of the local rules.

Once more we disagree. The Federal Rules require that a notice of appeal "(A) specify the party . . . taking the appeal . . . ; (B) designate the judgment . . . being appealed; and (C) name the court to which the appeal is taken." Fed. R. App. P. 3(c)(1). Courts employ "a commonsense, purposive approach to determine whether a notice of appeal complies with the rules." *Gov't of the Virgin Islands v. Mills*, 634 F.3d 746, 751 (3d Cir. 2011). Indeed, "imperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court." *Becker v. Montgomery*, 532 U.S. 757, 767 (2001); *Mills*, 634 F.3d at 751; *see also id.* at 752 ("[A]s long as the judgment the party intends to appeal is fairly discernible, a notice of appeal will be deemed sufficient even though it references the wrong case number . . . or the wrong judgment date." (citations omitted)). Lee does not argue that the notice of appeal failed to answer any of these three critical questions. Following the Ninth Circuit, we thus reject the argument that the notice of appeal was invalid simply because it violated a local electronic filing requirement.[3] *See Klemm v. Astrue*, 543 F.3d 1139, 1143 (9th Cir. 2008) ("[A] notice of appeal is filed when it is received by the clerk, notwithstanding deficiencies in form that violate local rules

---

[3] That the notice of appeal confers appellate jurisdiction does not leave the district court "without other sanctions" for violations of local filing requirements. *Parissi*, 349 U.S. at 47; *see also Gould*, 555 F.2d at 341.

8

. . . [, including] failure to comply with the local electronic filing rules.").

Federal Rule of Civil Procedure 5(d)(4) supports our conclusion. It states that the "clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." Fed. R. Civ. P. 5(d)(4). In addition, Federal Rule of Appellate Procedure 3(c)(4) provides that an "appeal must not be dismissed for informality of form . . . of the notice of appeal." Our conclusion is further supported by Lee's failure to argue that the paper submission prejudiced him in any way. *Mills*, 634 F.3d at 752 ("While a lack of prejudice will not save a notice that totally fails to comply with the rules, courts understandably are more willing to overlook a notice's flaws in the absence of prejudice to the opposing party." (citations omitted)); *Sanabria v. United States*, 437 U.S. 54, 67 n.21 (1978) ("A mistake in designating the judgment appealed from is not always fatal, so long as the intent to appeal from a specific ruling can fairly be inferred by probing the notice and the other party was not misled or prejudiced.").

Lee's jurisdictional challenge is unpersuasive for another reason as well. In *Parissi*, the Supreme Court held that a clerk's office cannot reject a notice of appeal simply because the filing fee has not been paid.[4] 349 U.S. at 47

---

[4] We note there is some ambiguity about the status of *Parissi* because the Supreme Court Reporter, which is published by West, appears to label the opinion as a Memorandum Decision. *Parissi v. Telechron, Inc.*, 75 S. Ct. 577, 577 (1955). But the United States Reports, the official reporter for the Supreme Court, 28 U.S.C. § 411, treats the case as an opinion of the Court. *Compare* 349 U.S. LIII (1954) ("Cases reported before page 901 are those decided with opinions of

9

("[U]ntimely payment of the . . . fee did not vitiate the validity of petitioner's notice of appeal."). We have similarly instructed the clerk's offices in the Third Circuit to "accept and retain every notice of appeal tendered whether or not accompanied by the filing fee." *Gould v. Members of the N.J. Div. of Water Pol'y and Supply*, 555 F.2d 340, 342 (3d Cir. 1977). This rule applies whether a human clerk or an electronic filing system receives the notice. *See Farzana K. v. Ind. Dep't of Educ.*, 473 F.3d 703, 707 (7th Cir. 2007) ("The software that operates an e-filing system acts for 'the clerk' as far as Rule 5 is concerned; a step forbidden to a person standing at a counter is equally forbidden to an automated agent that acts on the court's behalf."); *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 143 (D.C. Cir. 2008) ("[T]he electronic case filing system's failure to docket

---

the Court. Those reported on pages 901 *et seq.* are memorandum decisions and orders."), *with Parissi*, 349 U.S. 46. The Supreme Court has cited *Parissi* as legal authority without questioning its status. *See Houston v. Lack*, 487 U.S. 266, 273 (1988). And in a dissenting opinion, Justice Harlan, joined by Justices Frankfurter and Burton, described *Parissi* as an "intervening and controlling decision" with respect to another case not before the Supreme Court at the time. *United States v. Ohio Power Co.*, 353 U.S. 98, 105 n.16 (1957). We have cited *Parissi* as legal authority at least three times, *Wisniewski v. Dir., Office of Workers' Comp. Programs*, 929 F.2d 952, 955 (3d Cir. 1991); *Gould v. Members of N.J. Div. of Water Pol'y and Supply*, 555 F.2d 340, 341 (3d Cir. 1977); *Rothman v. United States*, 508 F.2d 648, 651–52 & n.17 (3d Cir. 1975), and on one of those occasions it "mandated" our "result," *Gould*, 555 F.2d at 341. We therefore have little trouble concluding that *Parissi* is binding Supreme Court precedent.

Royall's timely submitted notice of appeal cannot be treated as a failure on his part to file timely. His situation is akin to one in which the clerk's office misplaces a filing and then later makes the docket entry when the filing is found.").

The parties agree that the Middle District's electronic filing system rejects notices of appeal that lack a simultaneous fee payment.  Appellant Br. at 29–30; Appellee Br. at 24.  If Lee were correct that under Local Rule 5.6 parties cannot establish appellate jurisdiction by submitting a paper notice of appeal, then the Commonwealth could not have submitted a notice of appeal without simultaneously paying the required filing fees.  This arrangement would clearly violate *Parissi*.  If so, Local Rule 5.6 would violate the Federal Rules by failing to provide a "reasonable exception[]" to the local electronic filing requirement, Fed. R. Civ. P. 5(d)(3), and the Commonwealth could not be held responsible for its violation.

As we have appellate jurisdiction, we proceed to the merits.

## III.  Standard of Review

### A.  *AEDPA Deference*

28 U.S.C. § 2254(e) of the Antiterrorism and Effective Death Penalty Act (AEDPA) requires federal *habeas* courts to "afford considerable deference to state courts' legal and factual determinations."  *Palmer v. Hendricks*, 592 F.3d 386, 391–92 (3d Cir. 2010).  A panel of our Court previously held,

however, that deference does not apply here. *Lee*, 667 F.3d at 403.[5] We therefore review the case without deference.

### B. Plain Error

The District Court rejected the Commonwealth's first and second objections to the R&R because they failed to identify with specificity any factual or legal errors. It thus reviewed the R&R for clear error rather than conducting a *de novo* review. On appeal, the Commonwealth does not challenge this legal conclusion. "[W]here a party fails to file timely objections to a magistrate judge's R&R in a habeas proceeding, and the district court then adopts the R&R, we . . . only review the R&R for plain error." *Nara v. Frank*,

_____

[5] Our opinion, issued in 2012, explained that Lee's *habeas* petition merits *de novo* review because the state courts "relied on only state law to deny [Lee's] PCRA petition, and there [was] no indication that the state courts analyzed Lee's federal claims." *Lee*, 667 F.3d at 403. Since this decision, the Supreme Court has held that when a state court "rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). Had we applied this rule in 2012, we may have held that AEDPA deference applies. We nonetheless review Lee's current case without AEDPA deference under law of the case. *See Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999). While this doctrine has an exception for intervening changes in the law, *id.*, the Commonwealth has not asked us to revisit the issue here.

12

488 F.3d 187, 194 (3d Cir. 2007). Lee argues that plain error thus applies because the District Court, in effect, decided that the Commonwealth failed to file any proper objections at all. As the Commonwealth concedes, its briefing does not dispute that plain error review applies. Oral Argument Tr. at 5:18.[6] At oral argument we asked why plain error review is inappropriate, and the only response was that the Commonwealth had "provide[d] some citations to [the R&R] when [it] raised [its] objection with regard to Magistrate Judge Carlson's characterization of the evidence." *Id.* 5:40. In our own review of the objections, we find no such citations to the R&R. Furthermore, a few citations would not have addressed the District Court's more fundamental concern that the Commonwealth's objections had "no basis in . . . law or fact contained in the R&R to be called into question." *Lee*, 2014 WL 3900230, at *5. As the Commonwealth fails to challenge this determination on appeal and fails to give any meaningful reason why plain error review is inappropriate, that is the review we undertake.

We therefore reverse only if there is (1) an error, (2) that is plain, (3) that "affects substantial rights," and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Nara*, 488 F.3d at 197 (internal quotation marks omitted).

## IV. Merits

A panel of our court previously held that "Lee must show that the admission of the fire expert testimony undermined the fundamental fairness of the entire trial because the probative value of [that] evidence, though

---

[6] *Id.* ("Court: Why should we not review this particular appeal for plain error? . . . Commonwealth: I agree it was not raised in appellant's brief in this matter . . . .").

13

relevant, [was] greatly outweighed by the prejudice to the accused from its admission." *Lee*, 667 F.3d at 403 (alteration in original) (citations and internal quotation marks omitted). The District Court accepted Magistrate Judge Carlson's conclusion that the admission of fire-science and gas-chromatography evidence at Lee's trial met this standard and the Commonwealth does not challenge this determination on appeal. Instead, it merely argues that the District Court erred by accepting Magistrate Judge Carlson's conclusion that the trial lacked "ample other evidence of guilt." *Id.* at 407 n.13 (citing *Albrecht*, 485 F.3d at 126). We now turn to the evidence presented at trial, including for the sake of completeness the now discredited evidence.

### A. *Unreliable Evidence at Trial*

#### 1. Fire-Science Evidence

The Commonwealth does not object to Magistrate Judge Carlson's assessment of the fire-science evidence presented at trial. He described it as follows. State Police Fire Marshal Thomas Jones testified that the fire was caused by arson based on two sources of evidence. First, he found patterns of deep charring, alligator charring (charring shaped like alligator skin), and crazed glass (finely fractured glass), all of which were consistent with a fire deliberately started with accelerant fluids. R&R at *5. Second, he found at least eight separate points of origin located throughout the cabin. According to the R&R, this was powerful evidence that someone intentionally started eight different fires in the cabin in rapid succession. *Id.* That one of the points was located at the cabin's door "suggested that the arsonist had acted in a particularly calculated fashion, setting fire to the escape path in the cabin, and effectively entombing Ji Yun Lee within a wall of flames." *Id.* at *6. Jones cited no other independent scientific evidence that arson caused the fire. *Id.*

14

Fire protection specialist Daniel Aston also testified on behalf of the Commonwealth. Relying on the same evidence discussed by Jones, Aston opined that the fire was set deliberately and with an accelerant. *Id.* He stated that the last fire was set at the front door of the cabin and that the arsonist "left the structure[] and probably lit [the cabin] from the outside at that point." *Id.* Based on the then-dominant scientific theory that arson fires burn at higher levels of heat and intensity, Aston compared the estimated heat and energy of the actual fire with the heat and energy that would have been produced by a "normal" fire. *Id.* at *7. He claimed his calculations could "determine with precision both the amounts and types of accelerants" used to light the fire: "62 gallons of home heating fuel, mixed with 12.2 pounds . . . of gasoline or Coleman fuel." *Id.*

According to Magistrate Judge Carlson, Jones's and Aston's testimony "constituted the principal pillar of proof tying Lee to th[e] arson fire and the death of his daughter." *Id.* Their testimony "was not directly supported by any other independent chemical testing[, as] the chemical analysis of the [eight] suspected fire origin sites did not reveal any sign of the more than 60 gallons of gas and fuel oil" that Aston estimated were used to set the fire. *Id.*

The Commonwealth concedes that, due to scientific developments since Lee's trial in 1990, the basis for all of this evidence is now invalid.

2.      Chromatography Evidence

The Commonwealth also does not challenge Magistrate Judge Carlson's assessment of the chromatography evidence presented at trial. According to the R&R, the fire-science evidence described above was bolstered by the testimony of State Police Chemist Thomas

15

Pacewicz, who conducted a gas chromatography of the shirt and pants worn by Lee on the night of the fire and of a burned jug and latex glove recovered from the wreckage. *Id.* Pacewicz found no evidence of accelerants at the eight origin sites identified by Jones and Aston, but testified that the chromatography analysis of the shirt, pants, and jug all revealed hydrocarbons that "ranged from C-7 to C-22." *Id.* He also testified that these results were consistent with a mixture of gasoline, kerosene, Coleman fuel and fuel oils. *Id.* Pacewicz thus corroborated Aston's testimony that this mix of chemicals was used to burn the cabin. *Id.* In its closing argument, the Commonwealth emphasized the mutually reinforcing link between the fire-science and chromatography evidence, which together showed that the fire was set by someone who intended to kill an occupant of the cabin and matched the mix of chemicals allegedly used to start it with the mix found on Lee's clothes. *Id.* at *8.

Magistrate Judge Carlson found, and the Commonwealth concedes, that subsequent scientific developments and retesting of surviving materials from the crime scene have undermined the reliability of Pacewicz's testimony. *Id.* at *17–18. On appeal, the Commonwealth does not rely on his testimony to show "ample evidence of guilt."

### B.   *What Evidence Remains?*

The Commonwealth argues that three remaining sources of evidence provide the "ample" evidence needed. First, Monroe County Coroner Robert Allen and Forensic Pathologist Isidore Mihalikis concluded, based on the autopsy of Ji Yun's body, that the cause and manner of death were conflagration and homicide, respectively. Allen testified that the body was found on the floor of the cabin a few feet from the bathroom door "in a fetal position," App. I at 133, under

16

"a bunch of insulation . . . and other debris" that had fallen from the roof, *id.* at 116–17. Allen and Mihalikis testified that there were "minimal" or "tiny" "hemorrhages in the upper portion of [Ji Yun's] neck," *id.* at 138, 405, 408, 420, that suggested "strangulation, . . . suffocation, or any pressure in the neck," *id.* at 408. They also found "minimal smoke deposits in the [victim's] windpipe and . . . lungs" and a "slight elevation of [her] carbon monoxide levels." *Id.* at 120, 405. They concluded that the hemorrhage, smoke deposits and elevated carbon monoxide were all consistent with Ji Yun being strangled before the fire was started.

As Magistrate Judge Carlson noted, this inference was weak. R&R at *9. Allen and Mihalikis both acknowledged that the autopsy results were consistent with Ji Yun dying by a flashover[7] rather than strangulation. App. I at 132–33, 406–407. Mihalikis found no evidence of petechiae—tiny ruptures of the capillaries caused by increased blood pressure—that are present in "most strangulation cases." *Id.* at 423. And Allen and Mihalikis's determination that Ji Yun died by homicide was almost certainly colored by the now-debunked fire-science evidence.

Second, the Commonwealth introduced testimony that in the hours and days after the fire Lee's demeanor showed little sign of grief. Police Officer Leigh-Manuell, one of the first individuals on the scene, found Lee sitting across from

---

[7] A flashover is a phenomenon that causes "a fire within a room to suddenly, spontaneously, and catastrophically engulf all flammable surfaces in th[e] room." R&R at *2. At the time of the trial, fire scientists incorrectly believed that flashovers were rare and that they left a "signature at a fire scene which could be distinguished from the tell-tale signs of arson." *Id.*

17

the fire on a bench with his luggage, appearing "nonchalant." *Id.* at 20–21, 27. Volunteer firefighter David Farry said Lee looked "very depressed, as if he was probably mad at himself." *Id.* at 56. High school senior David Pack described Lee as "calm." *Id.* at 162. Fire Marshall Jones testified that the day after the fire Lee was "very attentive" to questions asked of him, and "at times he even joked and laughed during the questioning." *Id.* at 256. Detective Bortz similarly described Lee as "calm." *Id.* at 621. And when Lee's wife arrived at the scene of the fire, she became visibly upset, and yet, according to Fire Marshall Jones, Lee "walked right by [her] like nothing happened." *Id.* at 257.

Third, the Commonwealth argues that there was evidence attacking the veracity of Lee's account of what happened the night of the fire. Two firefighters on the scene testified that the fire started in the front of the cabin and then traveled to the back, *id.* at 40–41, 57–58, which conflicts with Lee's testimony that when he walked out the front door the fire was in the back of the house.

The Commonwealth also points to inconsistencies in six different accounts Lee gave of what happened the night of the fire. Commonwealth Br. at 36–37. The basic outlines remain the same across each account: Lee woke up in the middle of the night, smelled smoke, walked through the cabin looking for his daughter, went outside, came back in and left again. *Id.* Most of the "inconsistencies" identified by the Commonwealth are better characterized as minor details mentioned on some occasions and omitted on others. For example, Lee only sometimes identified specific rooms he checked when he reentered the house; only sometimes mentioned grabbing his luggage before leaving the cabin the second time; and only sometimes said that he slipped and fell on liquid after reentering the cabin. *Id.* Only two discrepancies could bear any significance at all. In at least

18

one account, Lee reentered the house twice; in others he reentered only once. And in at least one account, Lee saw flames before he left the house the first time; in four others, he saw flames only when he reentered the cabin. *Id.* The District Court characterized these discrepancies as "minor," noting that they could be explained by errors in translation from Korean to English. R&R at *8.

\* \* \* \* \*

Based on the evidence identified by the Commonwealth, we cannot conclude that the District Court committed an error that was plain by adopting the R&R. As Magistrate Judge Carlson explained,

> [t]he Commonwealth [is] left to argue that its case . . . may be proven beyond a reasonable doubt based upon alleged inconsistencies in the Korean-to[-]English interpretation of statements made by Lee in the hours following his daughter's death; a cultural stoicism which was construed as nonchalance; . . . and autopsy results which agreed that Ji Yun Lee died from conflagration, but posited two alternate theories of this cause of death, one of which was wholly consistent with death in an accidental fire, and the other of which was supported by very little forensic evidence.

*Id.* at *18. Because the Commonwealth has not pointed to "ample evidence" sufficient to prove guilt beyond reasonable doubt, we affirm the District Court's grant of *habeas* relief.

19