**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-1977
_____

JOSEPH D. MARCY,
                              Appellant

v.

SUPERINTENDENT PHOENIX SCI;
THE DISTRICT ATTORNEY OF THE COUNTY OF
LUZERNE;
THE ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-17-cv-00411)
District Judge: Honorable Robert D. Mariani

Argued
January 17, 2024

Before: HARDIMAN, MATEY, and CHUNG,
_Circuit Judges_.

(Filed: July 30, 2024)

Tadhg Dooley
David R. Roth **[ARGUED]**
Wiggin & Dana
One Century Tower
265 Church Street
New Haven, CT 06510

Erik Fredericksen
Adela Lilollari
Thaddeus Talbot
Yale Law School
127 Wall Street
New Haven, CT 06511

    *Counsel for Plaintiff-Appellant*

Ronald Eisenberg
Office of Attorney General of Pennsylvania
1600 Arch Street
Suite 300
Philadelphia, PA 19103

James L. McMonagle, Jr. **[ARGUED]**
Luzerne County Office of District Attorney
200 N River Street
Wilkes-Barre, PA 18711

    *Counsel for Defendant-Appellees*

OPINION OF THE COURT

MATEY, *Circuit Judge*.

Thirteen years ago, a Pennsylvania jury convicted Joseph Marcy of raping his five-year-old daughter, D.M. Years after testifying against her father, D.M. recanted some of her testimony in a state postconviction relief hearing. Marcy now petitions for a writ of habeas corpus, arguing that due process demands his release. But no matter how Marcy frames his claim, *Teague v. Lane*, 489 U.S. 288 (1989), bars its application here. So we will affirm the District Court's order dismissing his petition.

## I.

### A.

D.M. lived with Marcy's mother, Michele Pardini. In June 2009, Pardini discovered D.M., then five years old, "touching herself inappropriately and behaving in sexual manners." App. 287. "[C]oncerned," she called the Luzerne County Children and Youth Services, and caseworker Holly Jones responded the same day. App. 287. Jones spoke with D.M. and asked the child how she learned that "touching her private parts felt good." App. 287. D.M. responded, "[b]ecause daddy likes to do it. . . . Daddy likes to touch my private parts." App. 287. D.M. told Jones of "various sexual acts her father made her perform including oral sex and vaginal sex. She went on to describe him using his hands and his mouth in these sex acts" and how she was "forced to perform oral sex on her

father." App. 287–88.[1] Alarmed, Jones arranged for D.M. to speak with Debbie Guziejka, an investigator with the County's Children and Youth Services, and D.M. repeated the same story: that her father "would touch her on different parts of her body." App. 384. She detailed specific acts, and she discussed times where "she told daddy no, but he wouldn't stop." App. 385.

The caseworkers at Luzerne County took D.M. to the Children's Advocacy Center of Northeast Pennsylvania, a nonprofit organization staffing clinicians and investigators. During her visit to the Center, D.M. spoke with Kristen Fetcho, a child forensic investigator, and told her the same details she shared with the County caseworkers. D.M. then met with Dr. Michael Rogan, a board-certified family practice physician. His examination revealed signs of chronic irritation, evidence of "more than an acute event such as like a diaper rash" and consistent with the conclusion "that the child had been sexually assaulted." App. 335.

When D.M. testified at trial nearly two years later, her story stayed the same. She detailed repeated sexual assaults and told the jury—just as she had told Jones, Guziejka, and Fetcho—that she asked her father to stop, and he refused. And she testified that she complained to her mother, who refused to believe her. After three hours of deliberation, the jury returned a unanimous conviction on all five counts in the indictment: rape of a child, two counts of involuntary deviate sexual intercourse with a child, aggravated indecent assault of a child, and assault to a person less than thirteen. Marcy was sentenced

---

[1] At trial, Jones testified that D.M. was "very matter of fact" when she explained these events. App. 291.

to 20 to 40 years' incarceration.

Shortly after sentencing, Marcy moved for a new trial. His motion advanced general arguments about insufficient evidence, erroneous evidentiary rulings, and his "belie[f]" that the sentence was "excessive and unreasonable." App. 633. The court denied the motion as moot after Marcy also filed a direct appeal. On appeal, Marcy argued that the trial court made an erroneous evidentiary ruling regarding reputation testimony. In both his (mooted) motion for a new trial and his direct appeal, Marcy never claimed that D.M. fabricated her testimony. The Superior Court of Pennsylvania affirmed his conviction, and Marcy did not appeal to the Pennsylvania Supreme Court.

**B.**

Marcy's first premature state petition for postconviction relief did not mention false testimony. A second premature petition checked boxes seeking relief due to "[a] violation of the Constitution" and "[i]neffective assistance of counsel," and requested an evidentiary hearing. App. 646. He did not check the box indicating "exculpatory evidence that has subsequently become available." App. 646. Nor did his second petition state D.M. had changed her story. Instead, between two accounts of a juror who allegedly proclaimed Marcy innocent,[2] was a piece

---

[2] These accounts, written by family acquaintances, describe an unidentified juror in the parking lot who stated, "in tears, smoking a cigarette, . . . that Mr. Marcy was innocent." App. 662. According to both accounts, the juror also said he was "sorry" about "the outcome of the trial and verdict." App. 662. The authors said they "believe[d] that [the] Juror was pressured into saying guilty." App. 665. Marcy never raised these claims in his later filings.

of paper dated February 2012 from a person named Kimberly Marth.[3] *See* App. 663 ("Marth note"). Addressed "[t]o whom it may concern," the Marth note said, "I am writing this letter in light of things told to me and several other people that, [D.M.] had not told the truth in her testimony at trial against her father" and "that certain acts of the abuse in fact did not happen at all." App. 663.[4] Because Marcy filed these petitions before his conviction became final, the postconviction court dismissed them without prejudice.

After Marcy's conviction became final, the postconviction court sua sponte reinstated Marcy's second untimely petition and appointed counsel to supplement Marcy's previous filings. That produced a supplemental petition—now drafted with help from counsel—that recycled Marcy's prior arguments about erroneous evidentiary rulings, ineffective assistance, and other errors unrelated to recantation but omitted the Marth note.

Another year passed before Marcy again supplemented his postconviction filings, now asking for relief based on "[t]he unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced." App. 684

---

[3] Marth's identity, and her connection to D.M., is not explained in the record. Neither Marcy's filings, nor the Pennsylvania court decisions, discuss Marth beyond references to the note. In this appeal, Marcy makes one mention of Marth serving as D.M.'s "caretaker" without describing the origin, scope, or length of that relationship. Opening Br. 10.

[4] The Marth note did not specify which acts of abuse were false. Nor did it explain the basis of Marth's suggestion that D.M. did not testify with complete candor.

6

(quoting 42 Pa. C.S. § 9543 (a)(2)(vi)). Marcy's newest filing focused on a new interview D.M. provided to a private investigator.[5] That led to a postconviction relief hearing where D.M., now eleven years old, testified that Marcy "did not do it."[6] App. 712. Recognizing this answer marked a sharp break from D.M.'s trial testimony, Marcy's counsel asked D.M. how the Judge was "supposed to know" which story was true. App. 713. D.M. answered, "I don't know." App. 713. The Commonwealth asked D.M. how she knew of specific sexual

---

[5] In that interview, according to Marcy, D.M. "recanted significant portions of her previous trial testimony, indicating that [Marcy] did not, at any time, have vaginal or anal sex with her." App. 684. But at the postconviction relief hearing, Marcy's attorney asked D.M. if she remembered "maybe a year or two ago talking to an older man . . . about what happened or didn't happen." App. 711. D.M. said, "Yes, I recall." App. 711. But when asked if she recalled "telling the man . . . that [the abuse] didn't happen," D.M. twice responded, "No." App. 712. Either way, Marcy—like the Marth note—did not claim that D.M.'s entire testimony was false, or that the abuse never happened.

[6] When D.M. testified at Marcy's postconviction relief hearing, she was living with her new adoptive mother, Kelly Gronka. Gronka's brother was dating Marcy's mother, Michele Pardini, at that time.

At the postconviction hearing, D.M. also testified that Gronka allowed her to talk on the phone with the imprisoned Marcy despite a no-contact order. And that she overheard phone calls between Gronka and Marcy, where they said they loved each other. And that Pardini moved in with D.M. and Gronka, where Pardini "talked about [Marcy]" and told D.M. "how much she missed" Marcy. App. 717.

7

acts and physiological effects at such a young age. Again, D.M. repeatedly responded: "I don't know."[7] App. 713–16.

Still, the Court of Common Pleas found D.M.'s recantation testimony "credible," App. 741, vacated Marcy's conviction, and granted him a new trial. On appeal, the Superior Court vacated that decision because Marcy "had knowledge of the victim's recantation in 2012 and did not raise it until 2014," and so waived his challenge. App. 771. The Pennsylvania Supreme Court declined to review that decision.

With Marcy's direct proceedings finalized, he filed this petition seeking release because his conviction was "secured by false evidence or testimony" in violation of due process. App. 79. The District Court concluded Marcy's recantation claim was time-barred and denied the petition. Marcy appealed, and we granted a certificate of appealability limited to "his claim that his conviction and continued incarceration in light of [D.M.'s] recantation violates his due process rights."

---

[7] *See* App. 714 ("Q: So how would you know that there would be naked people on a computer if you didn't actually see it? A: I don't know."); App. 714 ("Q: So how did you know about that hand motion? A: I don't know."); App. 714 ("Q: Then can you explain to the Court, why was it that you would have lied about something like that? A: Don't know."); App. 715 ("Q: How did you know at that age that a pickle would go in someone's mouth? A: I don't know. Q: Did someone tell you to say that? A: No. Q: Did you see that someplace? A: No."); App. 716 ("Q: Well, how did you know to say that your dad would only touch you when your mom was gone? A: I don't know.").

App. 28.[8]

## II.

A federal court can order the release of a state prisoner through a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas relief has

[8] The District Court had jurisdiction under 28 U.S.C. § 2254 and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253(c). We review the District Court's legal determinations de novo. *Albrecht v. Horn*, 485 F.3d 103, 114 (3d Cir. 2007). Because the postconviction relief court found D.M.'s recantation testimony "credible," App. 741, it is "presumed to be correct" in this proceeding, absent clear and convincing contrary evidence, 28 U.S.C. § 2254(e)(1); *see also Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 849–50 & n.9 (3d Cir. 2017).

The parties dispute whether Marcy procedurally defaulted on his constitutional claim. But we need not decide that issue. "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see also Duncan v. Morton*, 256 F.3d 189, 203 n.6 (3d Cir. 2001) ("The parties now dispute whether [Petitioner] has exhausted this claim for purposes of his federal habeas petition. Because this claim is clearly without merit, we decline to address the parties' exhaustion arguments.") (citing 28 U.S.C. § 2254(b)(2)). We adopt that course here and address only the merits.

always been limited,[9] and the Supreme Court has explained

[9] At common law, final convictions were unreviewable through the writ of habeas corpus, so long as the court of conviction had jurisdiction. *See Brown v. Davenport*, 596 U.S. 118, 128–29 (2022); *see also Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 203 (1830) (Federal courts "have no power to examine the proceedings on a writ of error, and it would be strange, if, under colour of a writ to liberate an individual from unlawful imprisonment, we could substantially reverse a judgment which the law has placed beyond our control."); 3 William Blackstone, Commentaries *407 ("The writ of error only lies upon matter of *law* arising upon the face of the proceedings; so that no evidence is required to substantiate or support it; there being no method of reversing an error in the determination of *facts*, but by an attaint, or a new trial, to correct the mistakes of the former verdict."). The Habeas Corpus Act of 1867 extended the writ to state prisoners but "did not empower the federal courts on habeas corpus to redetermine the merits of federal questions—even constitutional questions—which did not go to the jurisdiction of the committing court." Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 481 (1963); *see also* Judiciary Act of February 5, 1867, ch. 28, § 1, 14 Stat. 385, 385.

Then, "[i]n 1953," the Supreme Court "abruptly changed course and decided that federal courts could grant a writ of habeas corpus simply because they disagreed with a state court's judgment." *Edwards v. Vannoy*, 593 U.S. 255, 278 (2021) (Thomas, J., concurring) (citation omitted). This "greatly expanded writ of habeas corpus," *Desist v. United States*, 394 U.S. 244, 262 (1969) (Harlan, J., dissenting),

that federal courts ordinarily may not apply a new rule of law retroactively to grant a writ. *See, e.g.*, *Teague*, 489 U.S. at 310. That is because "applying 'constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.'" *Edwards v. Vannoy*, 593 U.S. 255, 263 (2021) (quoting *Teague*, 489 U.S. at 309). So while "[a] new rule of criminal procedure applies to cases on *direct* review, . . . . a new rule of criminal procedure ordinarily does not apply retroactively to overturn final convictions on federal *collateral* review." *Id.* at 262.

Marcy argues that his continued incarceration for a conviction resulting from testimony recanted after trial violates the Constitution, no matter how that testimony was introduced or whether any state actor knew it to be false. Simply stated, Marcy argues he has a right to be free from continued conviction obtained by credibly recanted testimony, regardless of the government's knowledge of the testimony's falsity. And he argues that this right existed at the time of his conviction. But neither the Supreme Court nor this Court have ever so held, and *Teague* bars a retroactive application of Marcy's claimed

triggered questions about the relief federal courts could grant when applying new constitutional procedures to old criminal convictions, *see generally Edwards*, 593 U.S. at 278 (Thomas, J. concurring). After several decades of the resulting "atextual and ad hoc approach," *id.* at 279 (Thomas, J., concurring), Congress stepped in with the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which "filled in" the gaps left by the Act "by creating a comprehensive system for addressing federal habeas claims brought by state prisoners," *id.* at 280 (Thomas, J., concurring).

11

right as a novel rule of criminal procedure.[10]

## A.

A rule[11] is new "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301; *see also Graham v. Collins*, 506 U.S. 461, 467 (2004). To ensure that habeas proceedings "cannot be used as a vehicle to create new constitutional rules of criminal procedure," *Teague*, 489 U.S. at 316, a novel rule cannot be applied retroactively to cases on collateral review unless it is "substantive." *Whorton v.*

---

[10] *Teague* is "[a] threshold question in every habeas case." *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). While "not 'jurisdictional' in the sense that [federal courts] . . . must raise and decide the issue *sua sponte*," *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (emphasis omitted), *Teague* may be applied by a federal court even if not argued by the government, *see Caspari*, 510 U.S. at 389. Although the Commonwealth failed to raise *Teague* until prompted by this Court in supplemental briefing, we will apply *Teague* here.

[11] Marcy's alleged right is founded in substantive due process—his conviction is unconstitutional "regardless of the fairness of the procedures used" by the state. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotations omitted). But whether the right is substantive or procedural for due process is unrelated to whether the proposed *rule* is one of substance or one of procedure for the purposes of *Teague*. *See, e.g.*, *Goeke v. Branch*, 514 U.S. 115, 117–20 (1995) (recognizing that a new substantive due process right was barred as a new procedural rule under *Teague*).

12

*Bockting*, 549 U.S. 406, 416 (2007). [12] Meaning it "places

---

[12] *Teague*'s distinction between procedural and substantive rules followed a period after *Brown v. Allen*, 344 U.S. 443 (1953), when the habeas "haystack just grew too large," and courts struggled to determine when constitutional decisions from collateral review of criminal cases could be retroactively applied. *Edwards*, 593 U.S. at 288–89 (Gorsuch, J., concurring). *Teague* sought shelter from the sea of "incompatible rules and inconsistent principles" identified by those raising the alarm, *Desist*, 394 U.S. at 258 (Harlan, J., dissenting), and to "return the writ to its original station" by withholding "newly recognized rules of criminal procedure" from final criminal judgments, *Edwards*, 593 U.S. at 291, 290 (Gorsuch, J., concurring). In this way, *Teague* refocused courts to the traditional understanding of the writ as a limited tool of review and retreated from the misguided project of deciding retroactivity case-by-case. *See Linkletter v. Walker*, 381 U.S. 618, 629 (1965); *see also* Paul J. Mishkin, *Foreword: The High Court, the Great Writ, and the Due Process of Time and Law*, 79 Harv. L. Rev. 56, 66 (1965) ("[T]he establishment and application of a power of prospective limitation produces sharp and recurrent conflict with the symbolic ideal reflected in the Blackstonian concept . . . ."). The decision also reoriented collateral habeas review toward to the classical judicial role not to "pronounce a new law, but . . . maintain and expound the old one." 1 Blackstone, Commentaries *69. Asking whether a judgment "shall 'apply' retroactively [] presupposes a view of our decisions as *creating* the law, as opposed to *declaring* what the law already is. Such a view is contrary to that understanding of 'the judicial Power.'" *Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 201 (1990) (Scalia, J., concurring) (citing U.S. Const., Art. III, § 1).

certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *Teague*, 489 U.S. at 311 (quoting *Mackey v. United States*, 401 U.S. 667, 692 (1971)) (quotation marks omitted), or "prohibit[s] imposition of a certain type of punishment for a class of defendants because of their status or offense," *Sawyer v. Smith*, 497 U.S. 227, 241 (1990).[13] We first look at the legal landscape at the time Marcy's conviction became final[14] to determine whether his alleged right was "dictated" by the existing precedent at that time. *Teague*, 489 U.S. at 301 (emphasis omitted). "[A] rule is new unless, at the time the conviction became final, the rule was already 'apparent to all reasonable jurists.'" *Edwards*, 593 U.S. at 265 (quoting

---

[13] *See also Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (describing "substantive" rules under *Teague* as those that "alter[] the range of conduct or the class of persons that the law punishes"); *Bousley v. United States*, 523 U.S. 614, 620–21 (1998) (Substantive rules "hold[] that a . . . statute does not reach certain conduct" or "make conduct criminal."); *Saffle v. Parks*, 494 U.S. 484, 495 (1990) (Substantive rules "decriminalize a class of conduct [or] prohibit the imposition of . . . punishment on a particular class of persons.").

A second exception for "watershed rules of criminal procedure," *Teague*, 489 U.S. at 311, has never been applied by the Supreme Court "in the 32 years since *Teague*," *Edwards*, 593 U.S. at 258–59. And the Supreme Court has only identified one pre-*Teague* rule that would have qualified as a "watershed" rule: the right to counsel recognized in *Gideon v. Wainwright*, 372 U.S. 335 (1963).

[14] Marcy's conviction became final on August 27, 2012. But because Marcy's proposed rule is novel, *see infra* Section II.A.1–3, this date does not affect our analysis.

*Lambrix v. Singletary*, 520 U.S. 518, 528 (1997)). Marcy cannot clear this threshold hurdle.

**1.**

The Supreme Court has never recognized Marcy's alleged right to be released from a conviction involving recanted testimony where no state actor knew about the falsity of the statements. Start with *Mooney v. Holohan*, where the habeas petitioner contended that due process was violated where "the sole basis of his conviction was perjured testimony," which was "knowingly used" by the prosecution. 294 U.S. 103, 110 (1935). The Supreme Court agreed, finding that where "a state has contrived a conviction . . . through a deliberate deception" using "testimony known to be perjured," the government violates due process. *Id.* at 112. There, the focus was on the government's unjust actions, a "contrivance . . . inconsistent with the rudimentary demands of justice." *Id. Pyle v. Kansas* reiterated that a habeas petitioner's claims that "his imprisonment resulted from perjured testimony, knowingly used by the State authorities" sufficiently alleged a due process violation. 317 U.S. 213, 216 (1942). But *Hysler v. Florida* emphasized that habeas petitioners "cannot, of course, contend that *mere* recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction." 315 U.S. 411, 413 (1942) (emphasis added). Rather, recantation claims require proof that "responsible officials *knowingly used* false testimony." *Id.* (emphasis added). None of these cases turned on mere falsity: the key was that the state knew of the falsehood and used it anyway.

15

**2.**

For over fifty years, this Court has followed the requirement that the government have knowledge of testimony's falsity for the defendant to raise a viable due process claim. *See United States ex rel. Almeida v. Baldi*, 195 F.2d 815, 820–21 (3d Cir. 1952) (citing *Mooney* as the "controlling authority. . . . for seventeen years"). Swimming against that tide, Marcy points to a single case: *Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958). But *Curran* simply applied the existing principle that a conviction based on the government's knowing use of false testimony is unconstitutional. *See id.* at 712–13 (collecting state-knowledge cases, including *Mooney*, *Baldi*, and *Pyle*). In *Curran*, the petitioners argued that the state detective lied on the witness stand, pointing out that "[t]he record le[ft] no doubt that [his] testimony was untrue." *Id.* at 710. While the "knowledge of such perjury" could not be "brought home to the prosecuting officers," we held that "the knowingly false testimony" of a state actor violated due process. *Id.* at 712–13.[15]

_____

[15] A conclusion adopted by the Supreme Court in *Napue v. Illinois*, where, citing *Baldi*, the Court held a due process violation "obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. 264, 269 (1959); *see also id.* ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.") (citing *Curran*, 259 F.2d at 707). Leading to the famous formulation of the right recognized in *Brady v. Maryland*, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

And in *Smith v. United States*, the petitioner, like Marcy, argued "that the [g]overnment witnesses were not telling the truth" but failed to "allege any facts to show the [g]overnment knowingly used false testimony at the trial." 358 F.2d 683, 684 (3d Cir. 1966). We called government knowledge a "matter[] of substance" and concluded its "absence constitute[d] a fatal defect" in the petitioner's perjury argument. *Id. Smith* followed earlier decisions of this Court rejecting petitions that claimed perjury but failed "to show the knowing and intentional use of [that] perjury by the prosecution." *United States ex rel. Helwig v. Maroney*, 271 F.2d 329, 332 (3d Cir. 1959); *see also id.* ("[T]he burden is upon the appellant to prove such perjury and that it was knowingly and intentionally used by the prosecution.").[16]

---

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). *Brady* now governs those kinds of challenges, *see, e.g.*, *Dennis v. City of Phila.*, 19 F.4th 279, 291–92 (3d Cir. 2021), which explains why decisions like *Curran* and *Smith v. United States*, 358 F.2d 683 (3d Cir. 1966), have all but disappeared from the federal reporters. *Curran* foreshadowed an entirely different rule than the one Marcy suggests.

[16] District courts have long relied on *Smith* to dismiss habeas petitions that fail to show just that. *See, e.g.*, *Hauls v. Meyers*, No. Civ. A. 03-4866, 2004 WL 73902, at *8 (E.D. Pa. Jan. 14, 2004) (dismissing habeas petition that "fail[ed] to show that the government knowingly used [perjured] testimony to its benefit"); *United States v. Sanders*, 3 F. Supp. 2d 554, 567 (M.D. Pa. 1998) (citing *Smith* for the proposition

17

Marcy has not shown (or even argued) that any government actor knew (or could have known) Marcy's daughter would change parts of her story after trial. *Curran* and *Smith*, therefore, cannot ground Marcy's claim as he suggests.[17] In sum, his requested rule is not "dictated" by our precedent. *Teague*, 489 U.S. at 301 (emphasis omitted).

**3.**

Nor do the two outlying decisions Marcy cites from the Second and Ninth Circuits—*Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988) and *Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010), *cert. denied*, 565 U.S. 1138 (2012)—show a rule "apparent to all reasonable jurists." *Edwards*, 593 U.S. at

---

that the "government must knowingly use perjured testimony to warrant relief under [28 U.S.C.] § 2255"); *Rivera v. Gov't of V.I.*, No. 31-1973, 1973 WL 354140, at *1 (D.V.I. July 5, 1973) ("The majority rule . . . is that the petition must allege that the prosecuting attorney knowingly offered perjurious testimony of a material nature."); *United States ex rel. Cornitcher v. Myers*, 253 F. Supp. 763, 764 (E.D. Pa. 1966) ("The essence of the offensive conduct is conviction through contrivance, and it follows that there must be an allegation and proof that the prosecutor knew the testimony to be false.") (citing *Smith*, 358 F.2d at 683).

[17] Marcy also mentioned *Lee v. Superintendent Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015), at oral argument, but that case dealt with "flawed forensic evidence" or "other junk science." *Gimenez v. Ochoa*, 821 F.3d 1136, 1143–44 (9th Cir. 2016) (citation omitted). Unsurprisingly, *Lee* did not even cite *Curran*.

18

265.[18] The *Sanders* panel found a constitutional violation without evidence of prosecutorial knowledge, but it also conceded that "many jurisdictions," including this Court, reached the opposite holding and required evidence "that the

---

[18] And they place Marcy on the wrong side of an eight-to-two circuit split. *See Smith*, 358 F.2d at 684 (dismissing habeas petition because it failed to "allege any facts to show the [g]overnment knowingly used false testimony at the trial"); *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980) ("[F]or perjury by a witness to constitute grounds for relief appellant would have to show that the [g]overnment knowingly used the perjured testimony."); *Burks v. Egeler*, 512 F.2d 221, 226 (6th Cir. 1975) ("A requirement of state involvement [is] a prerequisite to finding constitutional error . . . ."); *United States ex rel. Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir. 1980) ("It is the knowing and intentional use of [perjured] testimony by the prosecuting authorities that is a denial of due process of law.") (citation omitted); *Lindhorst v. United States*, 658 F.2d 598, 601 (8th Cir. 1981) (dismissing habeas petition because "appellant failed to establish the government's knowing use of the perjured testimony"); *Graham v. Wilson*, 828 F.2d 656, 659 (10th Cir. 1987) ("In our habeas corpus consideration of the introduction of false or mistaken testimony, the question of error turns not on the witness' knowledge of falsity, but on the *government's* knowledge."); *Smith v. Wainwright*, 741 F.2d 1248, 1257 (11th Cir. 1984) (requiring evidence "that the prosecutor or the police officers knew that the testimony of one of the [witnesses] was false"); *Hodge v. Huff*, 140 F.2d 686, 689 (D.C. Cir. 1944) (rejecting perjury argument because "[t]here is nothing in the record to support or even to suggest bad motive, or misconduct upon the part of the prosecution").

prosecutor knowingly used perjured testimony." 863 F.2d at 222 & n.2 (citing *Smith*, 358 F.2d at 683).[19] The *Sanders* panel also lacked the guidance of *Teague*, decided less than three months later. When the case returned to the Second Circuit, the state raised *Teague*, and the new panel concluded "that the rule of *Sanders I* falls squarely within one of the exceptions to the retroactivity doctrine," the "application of 'watershed rules of criminal procedure.'" *Sanders v. Sullivan*, 900 F.2d 601, 606–07 (2d Cir. 1990) (*Sanders II*)). But that reasoning is now foreclosed by *Edwards* because "[t]he watershed exception is moribund." *Edwards*, 593 U.S. at 272.; *id.* at 267 (noting that, with the exception of *Gideon*, "[t]he Court has never identified any other pre-*Teague* or post-*Teague* rule as watershed. None.").

The Ninth Circuit's decision in *Maxwell* is similarly unhelpful to Marcy. The panel held that "a conviction based on uncorrected false material evidence . . . is a violation of a defendant's due process rights under the Fourteenth

---

[19] *Sanders* struggles to find footing to steady its lack of a state-actor-knowledge rule in pre-*Brady* cases of perjury by state actors. *See Sanders*, 863 F.3d at 222–23 (purporting to find "precedent for this rule" in *Kyle v. United States*, 266 F.2d 670, 672 (2d Cir. 1959) (perjury of a postal inspector), *Smith v. United States*, 223 F.2d 750, 754 (5th Cir. 1955) (perjury of government agent at sentencing hearing), and *Curran*, 259 F.2d at 707). It also found inspiration in "the spirit of the Constitution." *Id.* at 225. And it leaned heavily on Justice Douglas's dissenting opinion in *Durley v. Mayo*, 351 U.S. 277, 290–91 (1956). *See id.* at 223. A point the Second Circuit later acknowledged when it declined to follow *Sanders*. *See Drake v. Portuondo*, 321 F.3d 338, 345 n.2 (2d Cir. 2003).

Amendment." 628 F.3d at 507. But *Maxwell* relied on *Sanders* and cases involving knowing government actors. *See id.* at 506 (citing *United States v. Young*, 17 F.3d 1201, 1203–04 (9th Cir. 1994) (perjury of police officer); *Hall v. Dir. of Corr.*, 343 F.3d 976, 980 (9th Cir. 2003) (per curiam) (perjury by jailhouse informant after "police threatened to kill him and his mother if he did not lie"); *Killian v. Poole*, 282 F.3d 1204, 1208–09 (9th Cir. 2002) (citing *Young* to find government knowledge immaterial)).

To sum up: one outlier case (and another that relied on it) from outside of this Circuit that is inconsistent with our precedent does not establish a rule "apparent to all reasonable jurists." *Edwards*, 593 U.S. at 265. Leaving Marcy without any meaningful support, let alone the broad and clear consensus of cases needed to circumvent *Teague*'s bar against applying new rules to Marcy's petition.[20]

---

[20] Marcy offers an alternative framing of his proposed right: that he is "actually innocent," making his continued incarceration a violation of due process. While arguably beyond the question certified for appeal, this contention fails regardless. The Supreme Court has "repeatedly left that [issue] unresolved, while expressing considerable doubt that any claim based on alleged 'actual innocence' is constitutionally cognizable." *In re Davis*, 557 U.S. 952, 955 (2009) (Scalia, J., dissenting); *see also Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) ("We have struggled with [the actual-innocence claim] over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."). Whatever the

**B.**

Marcy faces a second hurdle: his proposed rule can circumvent *Teague*'s nonretroactivity principle only if it is "substantive," meaning it "prohibit[s] imposition of a certain type of punishment for a class of defendants because of their status or offense," *Sawyer v. Smith*, 497 U.S. 227, 241 (1990), or changes the "range of conduct or the class of persons that the law punishes," *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) (citation omitted). Marcy's proposed rule falls outside these "extremely narrow" corridors. *Id.* at 352. It does not change what conduct can be criminalized, nor does it remove Marcy from a class of punishable offenders. It seeks instead to "regulate only the *manner of determining* the defendant's culpability," and is therefore a procedural rule that cannot be applied retroactively. *Id*. at 353.

\* \* \*

For these reasons, we will affirm the District Court's order denying Marcy's petition.

---

contours of such a right, it would entail an "extraordinarily high" burden of proof—one so high that no petitioner in our Court nor the Supreme Court has ever met it. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993). Marcy does not buck that trend. The Commonwealth offered other evidence outside of D.M.'s initial testimony, and her recantation leaves unexplained a host of incriminating facts (including D.M.'s other statements to adults and D.M.'s graphic and specific knowledge). So Marcy's alternative right is insufficiently grounded to survive *Teague*.